**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **ERONY PRATT, individually and as** | § | |
| **Representative of the estate of WAYNE** | § | |
| **PRATT, deceased** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. H-12-1770** |
| | § | |
| **HARRIS COUNTY, TEXAS,** *et al* | § | |
| | § | |
| **Defendants.** | § | |

**O R D E R**

Pending before the Court are Defendants Sheriff Adrian Garcia ("Sheriff Garcia"), Sergeant M. Coker ("Sergeant Coker"), and Sergeant E. Jones ("Sergeant Jones")'s Motion for Summary Judgment (**Instrument No. 63**); Defendant Harris County, Texas ("Harris County")'s Motion for Summary Judgment (**Instrument No. 72**); and Defendants Harris County Sheriff's Office Deputies Vincent Lopez ("Deputy Lopez"), Michael Medina ("Deputy Medina"), Brian Goldstein ("Deputy Goldstein"), Francisco Salazar ("Deputy Salazar"), Tarzis Lobos ("Deputy Lobos"), Brian Auzenne ("Deputy Auzenne"), Tommy Wilks ("Deputy Wilks"), Robert DeAlejandro ("Deputy DeAlejandro"), and Robert Goerlitz ("Deputy Goerlitz")'s Motion for Summary Judgment. (**Instrument No. 74**).

**I.**

**A.**

This is case of alleged use of excessive force by police officers against a suspect, Wayne Pratt ("Pratt" or "the deceased"), which ultimately ended with the suspect's death. Officers in this case are alleged to have tased, restrained, hog-tied, and otherwise subjected the deceased to

excessive force, after he behaved erratically and evasively. Plaintiff Erony Pratt ("Plaintiff"), the mother of the deceased, claims that the responding deputies used excessive and deadly force in violation of the Fourth Amendment. Furthermore, Plaintiff claims that superior officers and the county are liable for the constitutional violations. Defendants have asserted that they are entitled to qualified immunity.

<strong>B.</strong>

On May 12, 2010, at roughly 8:11 pm, the Harris County Sheriff's Office received numerous calls regarding a minor traffic accident and disturbance, and Deputy Lopez was dispatched to 623 West Drive. (Instrument No. 74-2 at 2). Witnesses testified to having heard a car accident, and then observing a white male, Pratt, exit his vehicle and begin behaving erratically. (Instrument Nos. 82-20; 82-21). There is some dispute about the exact order of events but the following is the account of the Sheriff's Office's response as recalled by the responding deputies.

Deputy Lopez arrived on the scene and found a vehicle with front end damage resting in a ditch and Pratt "running around in circles with his hands in the air." (Instrument Nos. 74-2 at 2; 82-18 at 10-11). Deputy Lopez testified that he did not know what caused the erratic behavior, but stated that his training told him it could have been a mental health issue, or drugs or alcohol. (Instrument No. 82-18 at 10-11). Pratt was running along a driveway and approached Deputy Lopez's vehicle. *Id*. at 17. Deputy Lopez testified that, when he arrived, Pratt became aggressive and took a "boxer stance." (Instrument No. 82-18 at 17-18).

At that time, roughly 8:18 pm, Deputies Medina and Goldstein arrived on the scene in separate vehicles. *Id*. at 20. Deputy Medina also testified that when he arrived, Pratt appeared as

though he was attempting to assault Deputy Lopez. (Instrument No. 74-3 at 3). Deputies Lopez and Medina approached Pratt and Deputy Lopez, and Deputy Goldstein testified that he asked Pratt if he was ok. (Instrument No. 74-4 at 2). According to Deputy Goldstein, Pratt did not respond. *Id*. Because of Pratt's aggression, Deputy Lopez testified that he unholstered his taser and that Pratt then began to walk away from him. *Id*. at 18. According to Deputy Lopez, he commanded Pratt to stop and Pratt continued to walk. *Id*. at 18-20. Statements by citizen witnesses confirm the deputies's claims that they asked Pratt to stop running on numerous occasions. (Instrument No. 82-21).

According to Deputy Lopez, at the time, Pratt had no visible injuries. (Instrument No. 82-19 at 18). However, Deputy Medina testified that Pratt was bleeding from both arms when he arrived at the scene. (Instrument No. 74-3 at 2). Deputy Goldstein also testified that Pratt appeared to be holding something in his left hand, but he could not identify what it was, until later when he identified that it was a lighter. (Instrument No. 74-4 at 3).

According to Deputies Lopez, Medina, and Goldstein, as they got closer to Pratt he began running to avoid them. (Instrument No. 74-4 at 3). At some point Pratt turned and appeared as though he might run into traffic. (Instrument Nos. 82-18 at 22; 74-4 at 3). At that time, Deputy Lopez deployed his taser, but he testified that Pratt continued to run into the street. (Instrument No. 82-18 at 23-24). According to Deputy Lopez, only one probe struck Pratt, and so the taser was ineffective. (Instrument No. 74-2 at 3). Deputies Goldstein and Medina also testified that they ordered Pratt to stop and get on the ground during this time.  (Instrument Nos. 82-18 at 25-26; 74-4 at 3). As Pratt continued to cross the street, Deputy Medina also deployed his taser, which struck Pratt. (Instrument Nos. 74-2 at 3; 74-3 at 3).

After Deputy Medina deployed his taser, Pratt fell to the ground. (Instrument No. 82-18 at 25-26). At this time, Deputy Goldstein ordered Pratt to put his hands behind his back, but the deputies testified that he resisted. (Instrument Nos. 74-2 at 3; 74-4 at 3). Accordingly, Deputy Medina cycled his taser again. (Instrument No. 74-2 at 3-4). Pratt continued to resist, and Deputies Goldstein and Lopez attempted to handcuff him. (Instrument No. 74-2 at 4). Deputy Medina testified that it was difficult to handcuff Pratt "because he was bloody, sweaty and fighting them." (Instrument No. 74-3 at 4). At this time, the deputies informed dispatch of the taser deployment and personnel notified Emergency Medical Services and patrol supervisor Sergeant Coker of the incident. (Instrument No. 74-2 at 4). Around this time, Deputies Wilks and Salazar arrived at the scene as backup, as did Deputy Auzenne and Deputy DeAlejandro, who was a probationary patrol deputy. (Instrument Nos. 74-5 at 2; 74-7 at 2; 74-8 at 2). Deputies Lobos and Goerlitz also arrived at the scene some time after the deployment of the tasers. (Instrument No. 74-6 at 2).

With the assistance of Deputies Lobos and DeAlejandro, Deputy Goldstein was able to handcuff Pratt while he was on his stomach. (Instrument Nos. 74-2 at 4; 74-3 at 4; 74-4 at 4; 74-6 at 2). Deputies Goldstein and Salazar then rolled Pratt over and attempted to get him to his feet, to move him off of the street. (Instrument Nos. 74-2 at 4; 74-3 at 4; 74-5 at 3). Deputies Goldstein and Salazar eventually got Pratt to his feet, but as they were walking him towards the squad car, he pulled away from Deputy Goldstein and tried to flee. (Instrument Nos. 74-3 at 4; 74-4 at 4). At that time, Deputy Salazar returned Pratt to the ground, at which point Pratt began rolling around and kicking at the deputies. (Instrument Nos. 74-4 at 4; 74-5 at 3). Deputy Goldstein testified that he was kicked in the groin twice before he was able to control Pratt's

legs. (Instrument No. 74-4 at 4). Deputy Salazar also testified that, during this time, he restrained Pratt by holding his left arm, and placing his right knee in Pratt's upper back. (Instrument No. 74-5 at 3). During this time, Deputy Wilks returned to his squad car to retrieve a nylon hobble. (Instrument No. 74-7 at 3). Deputy Medina testified that he cycled his taser again, in the middle of Pratt's back in what is referred to as a "drive stun." (Instrument No. 74-3 at 5). Downloads of the tasers after the incident showed that Deputy Lopez cycled his taser twice during this whole incident, each for five seconds, and that Deputy Medina cycled his taser five times during this incident, also for five seconds each time. (Instrument No. 82-16).

Deputy Goldstein continued to hold Pratt's ankles to prevent him from kicking or fleeing. (Instrument Nos. 74-3 at 5; 74-4 at 4). The deputies testified that Pratt's legs were crossed and his knees were bent, such that his feet were by his buttocks. (Instrument No. 74-6 at 3). Deputy Wilks then tied the hobble to Pratt's ankles. (Instrument No. 74-3 at 5; 74-7 at 3). Deputy Salazar testified that a hobble was deemed necessary because Pratt was such a large man, and was uncooperative and out of control. (Instrument No. 74-4 at 4). According to Deputy Goldstein, Pratt was mumbling incoherently during this time, and was on his stomach for one or two minutes before the hobble was applied. (Instrument No. 74-4 at 4-5). Multiple deputies testified that Pratt was behaving erratically and possibly on drugs. (Instrument Nos. 74-7 at 3; 74-10 at 2).

According to the deputies, the loose end of the hobble was held by Deputy Wilks, and was not secured to the handcuffs. (Instrument Nos. 74-3 at 5; 74-6 at 3-4; 74-7 at 3). Furthermore, multiple deputies testified that, while secured by the hobble, Pratt's legs were extended and flat. (Instrument No. 74-8 at 2). Deputy Lopez initially reported that the hobble was attached to the handcuffs, but later testified that he only "assumed" that Deputy Wilks had

used this technique. (Instrument No. 82-18 at 8-10). The deputies' account contradicts the reports by a responding EMS paramedic and by the Internal Affairs Department ("IAD"), both of which said that Pratt was "hog-tied." (Instrument Nos. 82-3 at 43-44; 82-35 at 4). Pratt was on his stomach at this time, and according to Deputy Medina, was held by deputies in that position for two or three minutes until Channelview Emergency Medical Services ("EMS") arrived on the scene. (Instrument No. 74-3 at 5).

EMS arrived on the scene at roughly 8:26 pm to treat Pratt. (Instrument Nos. 74-2 at 4; 82-35 at 3). Deputies Medina and Goldstein testified that Pratt was still talking when EMS arrived. (Instrument Nos. 74-3 at 4; 74-4 at 5). One of the EMS paramedics, Billy Slagle ("Slagle"), reported that, upon their arrival, Pratt was "hog-tied" and face down. (Instrument No. 82-35 at 3). According to Slagle, hog-tied meant that his hands and feet were both handcuffed and then attached to each other. (Instrument No. 82-35 at 3). Slagle also testified that, upon EMS's arrival, Pratt was not talking, and in fact was not breathing and had no pulse. (Instrument No. 82-35 at 4). The deputies, however, reported that it was not until EMS had removed the final taser probe that Pratt became non-responsive, and EMS had to begin CPR. (Instrument Nos. 74-2 at 4; 74-3 at 5). Deputy Goerlitz even testified that he was the first to notice that Pratt had appeared to stop breathing, and so had informed EMS to check his vitals again. (Instrument No. 74-10 at 3). Upon the request of EMS, the deputies removed Pratt's handcuffs and hobble at that time. (Instrument Nos. 74-2 at 4; 74-3 at 5). EMS performed CPR for three or four minutes and then placed Pratt on a stretcher and put him in the ambulance. (Instrument No. 74-3 at 5-6). Deputy Wilks then contacted Sergeant Coker and advised him of Pratt's condition. (Instrument No. 74-4 at 4).

During this time, Deputy Goldstein investigated Pratt's vehicle and found a Brillo pad and two full bottlers of beer. (Instrument No. 74-4 at 5). At that time, Deputy Goldstein informed EMS that drugs may have been involved in the accident. (Instrument No. 74-4 at 5). Deputy Goldstein then found numerous pieces of broken glass near where Pratt had struggled with the deputies, with what appeared to be crack cocaine residue. (Instrument No. 74-4 at 5). The broken glass later tested positive for cocaine. (Instrument No. 74-4 at 4).

Sergeant Coker arrived at the scene at roughly 9:05 pm and was advised of the incident. (Instrument No. 74-2 at 5). During this time, Deputies Auzenne and DeAlejandro interviewed witnesses about the car accident. (Instrument Nos. 74-2 at 5; 74-9). According to witnesses, Pratt had gotten into a car accident with another driver at the corner of West Road and South Drive and had attempted to flee the scene. (Instrument Nos. 74-4 at 5; 74-9 at 2). The other driver then observed Pratt drive into the ditch where his car was found, whereupon he exited the vehicle and began to behave erratically. (Instrument No. 74-9 at 2-3). According to witnesses, he began to remove his clothes, and jump up and down, and "behaved as if he were on fire." (Instrument No. 74-9 at 3).

Deputies Wilks and Salazar followed EMS to the hospital to maintain custody of Pratt. (Instrument No. 74-5 at 4). Upon arrival, they were informed that Pratt was breathing on his own again. (Instrument No. 74-5 at 4). EMS paramedic Slagle reported that Pratt did have a pulse again at 8:59 pm while at the hospital. (Instrument No. 82-35 at 4). Deputies Wilks and Salazar remained with Pratt until the night shift relieved them. (Instrument No. 74-5 at 5). Pratt was pronounced deceased at 5:25 am the following morning, on May 13, 2010. (Instrument No. 83-3 at 38).

An autopsy was conducted on Pratt on the date of death, May 13, 2010, by Darshan Phatak, M.D. ("Dr. Phattak"). (Instrument No. 82-6). Dr. Phattak identified numerous blunt force injuries, as well as evidence of the use of tasers, and the presence of cocaine and ethanol in Pratt's blood. (Instrument No. 82-6 at 24).   Ultimately, Dr. Phattak determined the cause and manner of death to be "UNDETERMINED." (Instrument No. 82-6 at 24). Dr. Phattak noted that the ingestion of cocaine and ethanol could not be separated from the contribution of asphyxiation during restraint. (Instrument No. 82-6 at 24). Furthermore, numerous injuries, including a rib cage fracture, could have been attributed to the car accident, the police restraints, or the resuscitation attempts. (Instrument No. 82-6 at 24).

However, Plaintiff's expert, Lee Ann Grossberg, M.D. ("Dr. Grossberg"), a forensic pathologist, disputes the conclusions in the autopsy report. (Instrument No. 82-36 at 8). Dr. Grossberg found numerous indicators of trauma inconsistent with Dr. Phattak's report. First, she noted that the hemhorrhage under the chin and on the neck were consistent with compressive force to the neck (Instrument No. 82-36 at 8). She also noted that some of the blunt force injuries would not have been caused by falls, a struggle on the ground, or a car accident, particularly contusions on the right side of Pratt's torso. (Instrument No. 82-26 at 8-9). Dr. Grossberg concluded that the cause of death was multifactorial, including the presence of drugs in Pratt's system, Pratt's existing health issues, the use of tasers, and the restraint of Pratt in a prone position and possible use of choke holds. (Instrument No. 82-26 at 10-11).

## C.

Plaintiff Erony Pratt, mother of the deceased, filed suit individually and as representative of Pratt on May 11, 2012, in the 295th Judicial Court of Harris County, Texas, against Harris County, Sheriff Garcia, Sergeant's Jones and Coker, and Deputies Medina, Lopez, Goldstein, Wilks, Salazar, Lobos, Auzenne, DeAlejandro, Goerlitz. (Instrument Nop. 1-2 at 4). Plaintiff brought 42 U.S.C. § 1983 actions under the Fourth Amendment for excessive force, failure to protect, and failure to supervise; § 1983 claims against Harris County for unlawful policies, failure to train, failure to supervise, and ratification; and a wrongful death claim under the Texas Tort Claims Act and Texas Civil Practices and Remedies Code §§ 71.002 and 71.021. (Instrument No. 1-2 at 10-23). On June 13, 2012, Defendants filed to remove the case to the Southern District of Texas pursuant to this Court's federal question jurisdiction and jurisdiction over civil rights cases under 28 U.S.C. §§ 1331, 1443. (Instrument No. 1). On September 10, 2012, Plaintiff filed an Amended Complaint. (Instrument No. 16).

On August 28, 2014, Defendants Sheriff Garcia and Sergeants Coker and Jones filed a motion for summary judgment. (Instrument No. 63). On November 5, 2012, Plaintiff filed a response, and on November 12, 2014, Defendants filed a reply. (Instrument Nos. 84; 86).

On September 16, 2014, Defendant Harris County filed a motion for summary judgment. (Instrument No. 72). On November 5, 2014, Plaintiff filed a response, and on November 24, 2014, Defendants filed a reply and objections. (Instrument Nos. 83; 88).

On September 16, 2014, Defendants Deputies Lopez, Medina, Goldstein, Salazar, Lobos, Auzenne, Wilks, DeAlejandro, and Goerlitz filed a motion for summary judgment. (Instrument

No. 74). On November 5, 2014, Plaintiff filed a response, and on November 18, 2014, Defendants filed a reply and objections. (Instrument Nos. 82; 87).

## II.

As a preliminary matter, Defendants have filed 26 objections to summary judgment evidence offered by Plaintiff in response to Defendant's motions for summary judgment. (Instrument Nos. 87; 88). The majority of Defendants' objections are as to the relevance of statements and evidence related to dangers associated with certain police practices and whether the deputies in question were trained on those dangers. Fed. R. Evid. 401.

On a motion for summary judgment, "the admissibility of evidence . . . is subject to the usual rules relating to form and admissibility of evidence." *Munoz v. Int'l Alliance of Theatrical Stage Emps. & Moving Picture Mach. Operators of U.S. & Can.*, 563 F.2d 205, 213 (5th Cir. 1977). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The hearsay rules as prescribed by Federal Rules of Evidence 801 and 802 apply with equal force in the summary judgment context. *Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006). Furthermore, conclusory statements, unsubstantiated and subjective beliefs, and speculative statements are not proper summary judgment evidence. *See Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

As the Court's analysis will show, the Court did not need to rely upon the evidence objected to by Defendants. Much of the evidence was duplicative of other evidence properly received and considered, and therefore, the Court's consideration of contested pieces of evidence was unnecessary to the resolution of these motions. *See Floyd v. Hefner*, 556 F.Supp.2d 617, 636

(S.D. Tex.  2008) (overruling objections to evidence which was duplicative of other evidence in the summary judgment record), *see also Romero v. Lynaugh*, 884 F.2d 871, 879 (5th Cir. 1989) (holding that failure to object to evidence which was duplicative of evidence properly received is not prejudicial). Accordingly, Defendants' objections are **OVERRULED**. (Instrument No. 87; 88). *Brantley v. Inspectorate Am. Corp.*, 821 F. Supp. 2d 879, 886 (S.D. Tex. 2011) (Gilmore, J.).

## III.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 322; *Warfield v. Byron,* 436 F.3d 551, 557 (5th Cir. 2006).

The "movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc*., 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex*, 477 U.S. at 322-25). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex*., 560 F.3d 316, 326 (5th Cir. 2009). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "showing — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. While the party

moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

After the moving party has met its burden, in order to "avoid a summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case." *Thomas v. Price*, 975 F.2d 231, 235 (5th Cir. 1992). The party opposing summary judgment cannot merely rely on the contentions contained in the pleadings. *Little*, 37 F.3d at 1075. Rather, the "party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim," *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 457, 458 (5th Cir. 1998); *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). Although the court draws all reasonable inferences in the light most favorable to the nonmoving party, *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008), the nonmovant's "burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux*, 402 F.3d at 540 (*quoting Little*, 37 F.3d at 1075). Similarly, "unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment." *Clark v. Am's Favorite Chicken*, 110 F.3d 295, 297 (5th Cir. 1997).

In deciding a summary judgment motion, the district court does not make credibility determinations or weigh evidence. *E.E.O.C. v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 612 n.3 (5th Cir. 2009).  Nor does the court "sift through the record in search of evidence to support a party's opposition to summary judgment." *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 379-80 (5th Cir. 2010); *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003); *Ragas,* 136 F.3d at 458; *Nissho-Iwai American Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir.1988) (it is not necessary "that the entire record in the case ... be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered"). Therefore, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara*, 353 F.3d at 405.

## IV.

42 U.S.C. § 1983 provides a private right of action for the deprivation of rights, privileges, and immunities secured by the Constitution or laws of the United States. "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citations omitted). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id*.

"Claims that law enforcement officers used excessive force are analyzed under the Fourth Amendment." *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003). "The Fourth Amendment's protection against unreasonable seizures of the person has been applied in causes of action under 42 U.S.C. § 1983 to impose liability on police officers who use excessive force

against citizens." *Colstent v. Barnhgart*, 130 F.3d 96, 102 (5th Cir. 1997).  To   show   excessive

force in violation of the Fourth Amendment, "a plaintiff must establish: (1) injury, (2) which

resulted directly and only from a use of force that was clearly excessive, and (3) the

excessiveness of which was clearly unreasonable." *Harris v. Serpas*, 747 F.3d 767, 772 (5th Cir.

2014) (citations omitted). Courts must assess the reasonableness of each defendant's actions

separately even if those defendants are found to be acting in unison. *Meadours v. Ermel*, 483

F.3d 417, 422 (5th Cir. 2007).

     The Supreme Court has held that courts must consider the "totality of the circumstances"

when assessing the reasonableness of law enforcement officer's use of force. *Graham v. Connor*,

490 U.S. 386, 396 (1989). "[T]he right to make an arrest or investigatory stop necessarily carries

with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*,

490 U.S. at 396. "To gauge the objective reasonableness of the force used by a law enforcement

officer, we must balance the amount of force used against the need for force paying careful

attention to the facts and circumstances of each particular case." *Luna v. Mullenix*, 765 F.3d 531,

537 (5th Cir. 2014). Courts, therefore, consider "the severity of the crime at issue, whether the

suspect poses an immediate threat to the safety of the officers or others, and whether he is

actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

Reasonableness is assessed "from the perspective of a reasonable officer on the scene, rather

than with the 20/20 vision of hindsight." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014)

(citing *Graham*, 490 U.S. at 396.

     The Supreme Court has long held that:

> Where the officer has probable cause to believe that the suspect poses a threat of
> serious physical harm, either to the officer or to others, it is not constitutionally
> unreasonable to prevent escape by using deadly force. Thus, if the suspect

> threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985). Therefore, the "[u]se of deadly force is not unreasonable when an officer would have reason to believe the suspect poses a threat of serious harm to the officer or others." *Mace*, 333 F.3d at 624. "[N]either the Supreme Court nor [the Fifth Circuit] has ever held that *all* of the *Graham* factors must be present for an officer's actions to be reasonable; indeed, in the typical case, it is sufficient that the officer reasonably believed that the suspect posed a threat to the safety of the officer or others. *Rockwell v. Brown*, 664 F.3d 985, 992 (5th Cir. 2011)

## A.

Plaintiff claims that Deputies Wilks, Medina, Salazar, Goldstein, and Lopez used excessive force in violation of the Fourth Amendment, through their use of tasers, prone restraint, hog-tying, and other unreasonable physical force. Plaintiff claims that Deputies Auzenne, DeAlejandro, Goerlitz, and Lobos were present and failed to protect Pratt from this excessive force. Plaintiff also claims that Sheriff Garcia and Sergeants Coker and Jones violated Pratt's Fourth Amendment rights by failing to supervise the deputies in question. All of the individual Defendants have asserted the defense of qualified immunity.

Qualified immunity is an affirmative defense that exists to shield government officials from liability "when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370-31 (5th Cir. 2011). The defense is available to government officials who perform discretionary functions "insofar as their conduct does not violate clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982). The standard serves to protect constitutional rights, while allowing government officials to effectively perform their duties. *Davis v. Scherer*, 468 U.S. 183, 195 (1984).

Although qualified immunity is an affirmative defense, the plaintiff bears the burden of negating qualified immunity once it has been properly raised by the defendant. *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009). To meet this burden, the plaintiff must show that the defendant committed an unreasonable violation of a clearly established constitutional right, or demonstrate that there is an issue of fact for the jury on this issue. *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005). The plaintiff cannot rest on conclusory allegations and assertions, but rather must demonstrate genuine issues of material fact regarding the reasonableness of the official conduct. *Id.*

Courts apply a two-prong test to determine whether a plaintiff has met this burden: (1) whether a constitutional right would have been violated on the facts alleged, and (2) whether the right at issue was "clearly established" at the time of the misconduct, rendering the conduct objectively unreasonable. *Saucier v. Katz*, 533 U.S. 193, 201 (2001). Courts are, however, permitted to exercise their sound discretion in determining which of the two prongs to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). A right is deemed to be clearly established when "the contours of the right [are] sufficiently clear [such] that a reasonable official would understand that what he is doing violated that right." *Wernecke v. Garcia*, 591 F.2d 386, 392 (5th Cir. 2009). "That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citations omitted). The Fifth Circuit has clarified that the plaintiff must "point to controlling

authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Morgan*, 659 F.3d at 371-72.

1.

First, Plaintiff has presented no evidence that Pratt's death resulted directly and only from an excessive use of force by Deputies Wilks, Medina, Lopez, Goldstein, and Salazar.  *See Harris*, 747 F.3d at 772. The autopsy report found that the cause of death was undetermined, because the ingestion of cocaine and ethanol could not be separated from the deputies' potential contributions to Pratt's asphyxiation. *See* (Instrument No. 82-6 at 24). Furthermore, Plaintiff's own expert, Dr. Grossberg, concluded that the cause of death was multifactorial, based on the conduct of the deputies, the presence of drugs in Pratt's system, and Pratt's existing health issues. *See* (Instrument No. 82-26 at 10-11). Insofar as Plaintiff asserts that Pratt's death is the injury in this claim, there is no evidence that it was caused directly and only by excessive force. *See Graniczny v. City of El Paso, Tex.*, 809 F. Supp. 2d 597, 610 (W.D. Tex. 2011) ("The Officers cannot be held responsible for the unexpected, albeit tragic result, of their use of necessary force."). However, there is ample evidence in the record that Pratt may have sustained numerous other physical injuries, including taser burns, neck injuries, and other blunt force injuries as a direct result of the use of force by the deputies. *See* (Instrument No. 82-6 at 24).

Plaintiff may overcome the presumption of qualified immunity in this case, by showing that there is a fact issue as to whether any of these Defendants unreasonably violated a clearly established constitutional right. *See Michalik*, 422 F.3d at 262. The Fifth Circuit has recognized the complexity of analyzing qualified immunity in the context of an excessive force claim, because of the "overlapping objective reasonableness inquiries." *See Lytle v. Bexar County,*

17

*Texas*, 560 F.3d 404, 410 (5th Cir. 2009). The plaintiff must show that Defendants unreasonably violated Pratt's clearly established constitutional rights, in this case by causing injury through unreasonably excessive force. *See Harris*, 747 F.3d at 772.

In *Deshotel v. Marshall*, 454 F. App'x 262 (5th Cir. 2011), the Fifth Circuit considered the use of force in subduing a burglary suspect. The court found that officers' straddling of the suspect, pulling on his arms, kneeling on his shoulder, and folding of his legs to stop him from kicking were all objectively reasonable, considering the size of the suspect and his immediate attempts to flee. *Id.* at 267-68.

The Fifth Circuit has also addressed when the use of a taser constitutes excessive force. The Fifth Circuit has noted that the use of a taser is not comparable to the use of a firearm and does not necessarily constitute deadly force. *Batiste v. Theroit*, 458 F. App'x 351, 354 (5th Cir. 2012) (Noting in the context of a deadly force analysis that there is no support "for the inference that the use of a taser is comparable to discharging a firearm. There are no cases in this circuit that support this proposition and we decline to so rule."). Courts have recognized that the question of whether a taser constitutes excessive force often turns on whether the taser is used while the suspect is resisting, as opposed to when the suspect is either not resisting or has ceased resisting. *See Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495-96 (6th Cir. 2012); *Williams v. City of Cleveland, Miss.*, No. 2:10CV215-SA-JMV, 2012 WL 3614418, at *8 (N.D. Miss. Aug. 21, 2012) *aff'd*, 736 F.3d 684 (5th Cir. 2013). Use of a taser in cases where the person is suspected only of a minor crime and does not attempt to flee or resist arrest, or has ceased resisting, is often found to be unreasonable. *See e.g. Newman v. Guedry*, 703 F.3d 757, 762 (5th Cir. 2012) *cert. denied sub nom. Guerdry v. Newman*, 134 S. Ct. 162 (2013); *Anderson v.*

*McCaleb*, 480 F. App'x 768, 773 (5th Cir. 2012). On the other hand, the Fifth Circuit has found that force, including the use of a taser, is often appropriate or at least entitled to qualified immunity, where the arrestee is resisting or violent. *See Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012), *see also Rakestrau v. Neustrom*, No. 11-CV-1762, 2013 WL 1452030, at *10 (W.D. La. Apr. 8, 2013) (describing the state of the law in the Fifth Circuit and elsewhere, and noting that whether the use of a taser constitutes excessive force generally turns on whether the arrestee is resisting or otherwise violent).

The Fifth Circuit has also, on multiple occasions, considered whether an officer's use of a hog-tie restraint constitutes excessive force. In *Gutierrez v. City of San Antonio*, 139 F.3d 441, 442-43 (5th Cir. 1998), the officers identified an undressed person walking through a crowded intersection, who informed them that he was on cocaine. The officers called an ambulance, and utilized a hog-tie after the man struggled with them and kicked an EMT in the chest. *Id*. at 443. The officers then placed the man in the back of their squad car and drove him to the hospital. *Id*. Upon arriving at the hospital, he was pronounced dead. *Id*. The Fifth Circuit held that in a very limited set of circumstances hog-tying may constitute excessive force. *Id*. at 451. The court focused on the existence of a study showing that hog-tying a person experiencing cocaine psychosis could result in death. *Id*. at 446-47, 449-51. The Fifth Circuit later clarified that to defeat qualified immunity under *Gutierrez*, a plaintiff must show: (1) drug use, (2) positional asphyxia, (3) cocaine psychosis, and (4) hog-tying. *See Wagner v. Bay City, Texas*, 227 F.3d 316, 323-24 (5th Cir. 2000).

The Fifth Circuit revisited this issue in *Hill v. Carroll County, Miss.*, 587 F.3d 230 (5th Cir. 2009). In *Hill*, the police responded to a fight between two women, and ultimately used a

hog-tie on one of the women who continued to kick and resist after being handcuffed. *Id*. at 232-33. The officers then placed that women in the backseat of their squad car, and when they arrived at the jail, she was pronounced dead. *Id*. at 233. The Fifth Circuit noted the limited nature of the *Gutierrez* opinion, and held that there was no excessive force, because the study on which *Gutierrez* relied had been called into question, and because of an absence of evidence that the present officers were aware of the study. *Id*. at 235-37. The Fifth Circuit has more recently held that the officers must be aware that the arrestee is on drugs, and thus at a heightened risk, for the rule in *Gutierrez* to apply. *Khan v. Normand*, 683 F.3d 192, 195-96 (5th Cir. 2012). The court has also continued to call into question the findings of the study relied upon in *Gutierrez*. *Id*.

Deputy Wilks is the officer alleged to have hog-tied Pratt during the altercation. While Deputy Wilks denies that he cuffed Pratt's feet to his hands , there is evidence to the contrary, and therefore there is a factual dispute about whether or not a hog-tie was employed. *See* (Instrument Nos. 82-3 at 43-44; 82-35 at 4). Nevertheless, in this context, the Court cannot find that Deputy Wilks's use of a hog-tie constituted an unreasonable violation of a clearly established constitutional right. *See Saucier*, 533 U.S. at 201. The fact that Deputy Wilks later testified that he believed hog-tying was unconstitutional speaks only to his awareness of the potential illegality of the practice, but does not inform this Court's determination of whether or not the underlying conduct was in fact unconstitutional. (Instrument No. 82-14 at 15-16). Furthermore, the fact that the practice may have been against departmental policies does not demonstrate a constitutional violation. *See Hernandez v. Estelle*, 788 F.2d 1154, 1158 (5th Cir. 1986). In this case, it is undisputed that Pratt was resisting the officers, and that, even after being cuffed, he continued to kick his legs at Deputy Goldstein. *See* (Instrument Nos. 74-2 at 3; 74-4 at

3-4). Plaintiff argues that Pratt was not resistant based on the witness statements of Cynthia Dean ("Ms. Dean") and Mike Holder ("Mr. Holder"). However, Plaintiff misrepresents these statements. Both Ms. Dean and Mr. Holder testified that they observed the incident from their windows, but both noted that parts of the incident were obscured. (Instrument Nos. 82-20; 82-21). Furthermore, both witnesses testified to Pratt's erratic, aggressive, and evasive behavior. *Id.* Mr. Dean specifically noted that Pratt was "scary looking," and that the deputies consistently asked for Pratt to stop running or stop resisting, and that they only utilized force when he was non-compliant. (Instrument No. 82-21). At no point, does either witness state that Pratt had ceased all aggression or resistance prior to some use of force by the deputies. Furthermore, there is no evidence that Deputy Wilks had any knowledge of Pratt's drug use. While Deputy Wilks testified that Pratt's erratic behavior suggested her might have been on drugs, (Instrument No. 74-7 at 3), there is no evidence that Pratt informed the deputies of his drug use, as the deceased had in *Gutierrez*. There is also ample testimony that Pratt was a very large man, and that the numerous responding deputies had struggled to restrain him. *See* (Instrument Nos. 74-4 at 4; 82-20; 82-21). The use of a hog-tie, has been found to be a reasonable use of force in restraining violently resisting arrestees, particularly where the officer is not expressly aware of factors such as drug use which might aggravate the risks of using such force. *Hill*, 587 F.3d at 235-37; *Khan*, 683 F.3d at 195-96. Assuming all disputed facts in favor of Plaintiff, Deputy Wilks is entitled to qualified immunity for his actions in restraining Pratt, because hog-tying Pratt under these circumstances did not constitute unreasonably excessive force. *See Saucier*, 533 U.S. at 201.

Deputy Medina is the primary officer alleged to have deployed his taser during the altercation. Deputy Medina responded to an accident and complaints of a disturbance, and,

according to his testimony, found Pratt, apparently preparing to assault Lopez. (Instrument No.s 74-3 at 3). There is no dispute that Medina deployed his taser while in pursuit of Pratt, who was evading Lopez at the time. (Instrument No. 74-2 at 3; 74-3 at 3). The taser downloads demonstrate that his taser was used five times, which is largely consistent with the testimony of the deputies; that Deputy Medina tased Pratt in probe mode while chasing him, and tased him numerous times in drive mode, while he was resisting the deputies' restraint. (Instrument No. 82-16). Courts have consistently found that the use of a taser where the suspect is resisting arrest or posing a threat to officers is reasonable, and that officers are entitled to qualified immunity in such cases. *See Poole*, 691 F.3d at 629; *Rakestrau*, 2013 WL 1452030, at *10. Assuming the facts in the light most favorable to Plaintiff, Deputy Medina responded to Pratt with measured and ascending actions, including the use of the taser to subdue Pratt. *See Poole*, 691 F.3d at 629. Assuming all disputed facts in favor of Plaintiff, Deputy Medina is entitled to qualified immunity for his use of a taser against Pratt, because tasing Pratt five times under these circumstances did not constitute unreasonably excessive force. *See Saucier*, 533 U.S. at 201.

The remaining deputies employed other force as they assisted Deputies Medina and Wilks in the restraint of Pratt. Deputy Salazar testified that he placed his knee on Pratt's back while he was being restrained by other deputies. (Instrument No. 74-5 at 3-4). Deputy Goldstein helped to restrain and handcuff Pratt, and while Pratt resisted, he held his legs, crossed them, and bent his knees so that his feet were close to his buttocks. (Instrument Nos. 74-2 at 3-4; 74-3 at 3-5; 74-4 at 3). Deputy Lopez was the first officer at the scene, and attempted to discharge his taser after Pratt appeared aggressive and then attempted to flee. (Instrument Nos. 82-18 at 23-24; 74-2 at 3). There is a dispute about precisely when Pratt was on his back or on his stomach, but the

level of force used by these deputies was reasonable given the size of Pratt, his numerous attempts to resist and escape, and his overall erratic behavior. *See Deshotel*, 454 F. App'x at 267-68. Based on a totality of the circumstances, the conduct of  Deputies Salazar, Goldstein, and Lopez entitles them to qualified immunity. *See Saucier*, 533 U.S. at 201.

Accordingly, Deputies Wilks's, Medina's, Salazar's, Goldstein's, and Lopez's motion for summary judgment on Plaintiff's Section 1983 actions is GRANTED.

<u>2.</u>

Plaintiff also alleges that Deputies Auzenne, DeAlejandro, Goerlitz, and Lobos were present and failed to protect Pratt from this excessive force. An officer can be liable under Section 1983 for failing to prevent another officer's use of excessive force where the bystanding officer: (1) knew that a fellow officer was violating an individual's constitutional rights, (2) had a reasonable opportunity to prevent the violation, and (3) chose not to act. *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013).

The Court has already found that the deputies who engaged in direct conduct with Pratt were entitled to qualified immunity. Therefore, the bystander deputies are entitled to qualified immunity on the issue of whether they knew a fellow officer was violating Pratt's constitutional rights. *See Whitley*, 726 F.3d at 646.

Accordingly, Deputies Auzenne's, DeAlejandro's, Goerlitz's, and Lobos's motion for summary judgment on Plaintiff's Section 1983 actions is GRANTED.

<u>3.</u>

Paintiff also claims that Sheriff Garcia and Sergeants Coker and Jones violated Pratt's Fourth Amendment rights by failing to supervise the deputies in question. (Instrument No. 84)

In § 1983 actions, supervisors cannot be held vicariously liable for the actions of subordinate government officials on a pure *respondeat superior* theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Rather, plaintiffs "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id*. Liability is found where supervisory officials affirmatively participate in acts that cause the constitutional violation or where they implement unconstitutional policies that result in injury. *Thompkins v. Belt*, 828 F.2d 298, 303-04 (5th Cir. 1987). Furthermore, where the supervisor is not personally involved in a constitutional violation, he or she may still be held liable for violations by subordinate employees where the supervisor acts, or fails to act, with deliberate indifference to the violations. *Atteberry v. Nocona General Hosp*., 430 F.3d 245, 254 (5th Cir. 2005). Where a plaintiff claims that a supervisor failed to train or supervise a subordinate officer, he or she must show the following elements: (1) the supervisor either failed to supervise or train the subordinate; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference to the constitutional right allegedly violated. *See Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381-82 (5th Cir. 2005).

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that the municipal actor disregarded a known or obvious consequence of his action." *Board of County Comm'rs of Bryan Cty v. Brown*, 520 U.S. 397, 410 (1997). The plaintiff cannot simply show negligence, or even gross negligence, but rather must demonstrate that the official was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm

exists, and . . . also draw the inference." *Estate of Davis ex rel. McCully v. city of North Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (citing *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). As applied to supervisor liability, government supervisors are found liable not only where there is a "substantial risk of serious harm," but where some deficiency by the supervisor is "obviously likely to result in a constitutional violation." *Estate of Davis*, 406 F.3d at 381.

Generally, proof of more than a single instance of lack of training or supervision causing a violation of constitutional rights is required to show deliberate indifference. *See Estate of Davis,* 406 F.3d at 381.

> To rely on the "single incident" exception, a plaintiff must prove that the "highly probable" consequence of a failure to train or supervise would result in the specific injury suffered, and that the failure to train or supervise represents the moving force behind the Constitutional violation.

*Khansari v. City of Houston*, No. CIV.A. H-13-2722, 2014 WL 1401857, *17 (S.D. Tex. Apr. 9, 2014) (citing *Estate of Davis*, 406 F.3d at 385-86). A failure to train claim must be based on an underlying constitutional violation. *Whitley*, 726 F.3d at 648.

The Court has already found that the deputies who engaged in direct conduct with Pratt were entitled to qualified immunity. Therefore, the supervisory officials are entitled to qualified immunity on the issue of whether they were deliberately indifferent to Pratt's constitutional rights through some failure to train or supervise the deputies. *See Whitley*, 726 F.3d at 648.

Furthermore, Plaintiff has offered no evidence to show that Sheriff Garcia or Sergeants Coker and Jones were deliberately indifferent to a constitutional violation in their failure to train or supervise the deputies. *See Estate of Davis*, 406 F.3d at 381-82.

Plaintiff argues that the supervisors were on notice of the need for training with respect to prone restraint, tasing, and hog-tying. Plaintiff notes that, in February of 2009, a jury in a Harris

County case found the County liable for the death of a man in custody who was repeatedly tased, restrained, and hog-tied. (Instrument No. 84-42). Plaintiff also relies on the testimony of Deputy Garrett Demilia, an Academy Trainer, who testified that his general training for deputes did not cover hog-tying specifically. (Instrument No. 84-28 at 21). However, Deputy Demilia specifically notes that the practice is outlawed, and that he does not know if hog-tying is addressed in other trainings. *Id*. Moreover, all of the deputies were trained to state standards and on the procedures of the Harris county Sheriff's office and were licensed by the State of Texas as peace officers. (Instrument No. 63-3 at 2). There is no evidence that the training program in question did not "enable officers to respond properly to the usual and recurring situations with which they must deal." *See Benavides v. Cnty. of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989)). Furthermore, Plaintiff has offered no evidence that any of the supervisors had actual knowledge of any prior incidents or of a risk of constitutional violations, so as to demonstrate deliberate indifference. *See McClendon v. City of Columbia.* 305 F.3d 314, 326 (5th Cir. 2002). Nor does one prior incident demonstrate that the department's alleged failure to specifically train on these issues was likely to result in constitutional violations. *See Estate of Davis*, 406 F.3d at 381. There is no evidence that the failure to train or supervise in this case amounts to deliberate indifference to the constitutional right allegedly violated. *Id*.

Therefore, Sheriff Garcia and Sergeants Coker and Jones are entitled to qualified immunity. *See Saucier*, 533 U.S. at 201. Accordingly, Sheriff Garcia's and Sergeants Coker's and Jones's motion for summary judgment on Plaintiff's Section 1983 actions is GRANTED.

26

**B.**

Plaintiff also claims that Harris County is liable for violations of Pratt's constitutional rights. Plaintiff offers numerous theories of liability based on the County's official policies, informal policies, failure to train, failure to supervise, and ratification. (Instrument No. 83).

In *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), the Supreme Court held that municipalities are persons subject to lawsuits under 42 U.S.C. § 1983. However, as in the case of supervisory liability, municipalities cannot be held liable on a *respondeat superior* basis. *Monell*, 436 U.S. at 690-91. Rather, for a municipality to be held liable under Section 1983, the municipality itself must cause a violation of constitutional rights. *Monell*, 436 U.S. at 694-95.

> [I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell*, 436 U.S. at 694-95. To state a claim for municipal liability under § 1983, a plaintiff must identify: (a) a policy maker, (b) an official policy, custom, or widespread practice, and (c) a violation of constitutional rights whose moving force is the policy or custom. *See Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir.2001). A plaintiff must do more than identify conduct attributable to the municipality; he or she must demonstrate that the municipality was the "moving force" behind the injury alleged. *Bryan County*, 520 U.S. at 404. "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bryan County*, 520 U.S. at 404.

An official policy under *Monell* is a "policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority." *Bennett v. City of Slidell,* 735 F.2d 861, 862 (5th Cir. 1984). Alternatively, a policy may be a "persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Bennett*, 735 F.2d at 862. "Allegations of an isolated incident are not sufficient to show the existence of a custom or policy." *Fraire v. City of Arlington,* 957 F.2d 1268, 1278 (5th Cir.1992). "Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority." *Bennett*, 735 F.2d at 862.

A municipality may also be liable on a "ratification" theory, if the "subordinate's decision is subject to review by the municipality's authorized policymakers" and "the authorized policymakers approve [the] subordinate's decision and the basis for it[.]" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). "For example, if a school board-a policymaker . . . approves a superintendent's decision to transfer an outspoken teacher, knowing of the superintendent's retaliatory motive for doing so, the government entity itself may be liable; but if the school board lacks such awareness of the basis for the decision, it has not ratified the illegality and so the district itself is not liable." *Milam v. City of San Antonio,* 113 F. App'x. 622, 626 (5th Cir.2004). "Whether a governmental decision maker has final policymaking authority is a question of law." *Pembauer v. City of Cincinnati,* 475 U.S. 469, 483 (1986).

"For a municipality to be liable on account of its policy, the plaintiff must show, among other things, either (1) that the policy *itself* violated federal law or authorized or directed the deprivation of federal rights or (2) that the policy was adopted or maintained by the municipality's policymakers with deliberate indifference as to its known or obvious consequences[.]" *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004) (citations omitted). The latter showing "generally requires that a plaintiff demonstrate at least a pattern of similar violations." *Burge v. St. Tammany Parish,* 336 F.3d 363, 370 (5th Cir.2003).

Inadequate training may be the basis of municipal liability in a limited number of circumstances. *City of Canton*, 489 U.S. at 388. As in the case of supervisory liability, municipality liability applies "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388. The Fifth Circuit has identified "two ways in which a plaintiff can establish a municipality's deliberate indifference to the need for proper training." *Kitchen v. Dallas Cnty., Tex.*, 759 F.3d 468, 484 (5th Cir. 2014). One way is to demonstrate that the municipality had notice of "a pattern of similar violations," which were "fairly similar to what ultimately transpired," and where the "prior act . . . involved injury to a third party." *Sanders-Burns v. City Of Plano*, 594 F.3d 366, 381 (5th Cir. 2010). The other approach, allows for liability based on a single incident in a "narrow range of circumstances where a constitutional violation would result as the highly predictable consequence of a particular failure to train." *Kitchen*, 759 F.3d at 484 (internal quotations omitted).

In this case, Plaintiff cannot show that Harris County had an official policy that authorized the purported constitutional violations. In fact, the Harris County Sheriff's Department had an express policy on the use of force by deputies which stated: "A Deputy is authorized only to use the necessary and reasonable amount of force to effect an arrest and deter any aggression or resistance on the part of the subject being arrested. The Deputy's actions will be guided by the offender's level of resistance, as identified above." (Instrument No. 83-41 at 18). Furthermore, the department had an explicit policy against the use of hog-tying. (Instrument No. 83-22).

Nor has Plaintiff demonstrated that certain practices were so persistent and widespread "as to constitute a custom that fairly represents municipal policy." *Bennett*, 635 F.2d at 862. Plaintiff relies on evidence that between 2007 and 2010, taserswere deployed more than three times during one incident on at least 24 occasions. (Instrument Nos. 83-43; 83-44). However, without knowing the circumstances of these cases, the most that can be said is that there was widespread usage of tasers. This says nothing of the reasonableness of taser usage on a given occasion. Plaintiff also notes that numerous deputies testified that they could not recall trainings on dangers associated with multiple tasings, or tasing somebody who is restrained or in an excited state. (Instrument Nos. 83-13 at 20; 83-19 at 21-22). However, that deputies do not recall training on this says nothing of whether or not some unconstitutional conduct was so widespread as to constitute an unofficial custom of Harris County. There is simply no evidence of a persistent and widespread practice fairly representing municipal policy. *See Bennett*, 735 F.2d at 862. Furthermore, the Court found that the force utilized in this case was not unreasonable, and

therefore, Plaintiff cannot show a violation of constitutional rights whose "moving force" is some policy or custom. *See Piotrowski,* 237 F.3d at 578.

Plaintiff also alleges that Harris County failed to properly train its officers on prone restraint, use of tasers, and implementation of crisis intervention techniques. Plaintiff's arguments here are largely the same as those asserted in the failure to train claim against the supervisory officials; specifically that deputies were not trained on hog-tying or on proper taser use. It is not enough to simply show that a particular officer is unsatisfactorily trained. *See City of Canton*, 489 U.S. at 390. The Court has already found that the conduct by the deputies in question was not unreasonable and that the supervisors are not liable on a failure to train theory of liability. Here too, Plaintiff has offered no evidence either that there was a pattern of similar violations or that a constitutional violation was a highly predictable consequence of the failure to train in this manner. *See Kitchen*, 759 F.3d at 484.

Plaintiff's final theory of municipal liability is that Harris County ratified certain unconstitutional conduct by failing to discipline deputies or change its policies following the IAD investigation of this incident. (Instrument No. 83 at 41-42). Plaintiff, specifically notes that the IAD investigation concluded that Pratt was hog-tied, and that the practice is prohibited. *See generally* (Instrument No. 83-3). The ratification theory is reserved for "extreme factual situations." *See Coon v. Ledbetter*, 780 F.2d 1158, 1161 (5th Cir. 1986). Even were this Court to find that the IAD investigation somehow ratified the underlying conduct of the deputies in this case, because the Court has found that conduct was reasonable, Plaintiff cannot show that the IAD investigation was the moving cause of any constitutional violation. *See Piotrwoski*, 237 F.3d at 578.

Therefore, Plaintiff has failed to provide any evidence of a violation of constitutional rights whose moving force was the policy or custom of Harris County. *See Piotrowski*, 237 F.3d at 578. Accordingly, Harris County's motion for summary judgment on all *Monell* liability constitutional claims is GRANTED.

## V.

Plaintiff has also sued Defendants for the wrongful death of Pratt under Texas Civil Practices and Remedies Code §§ 71.002, 71.021 and the Texas Tort Claims Act. However, a "plaintiff cannot pursue pendent state claims under the Texas Tort Claims Act where they are based on a single event, an event alleged under a contemporaneous § 1983 cause of action to be an intentional tort." *Drain v. Galveston Cnty.*, 979 F. Supp. 1101, 1104-05 (S.D. Tex. 1997) (*citing Taylor v. Gregg*, 36 F.3d 453, 457 (5th Cir. 1994). In this case, the "negligent" conduct alleged in Plaintiff's state law claim, is precisely the same as the intentional conduct alleged in the Section 1983 claims. *See generally* (Instrument No. 16). Plaintiff has offered no response on this issue.

Accordingly, Defendants motions for summary judgment on Plaintiff's claims under Texas Civil Practices and Remedies Code §§ 71.002, 71.021 and the Texas Tort Claims Act are GRANTED.

## VI.

Based on the foregoing, IT IS HEREBY ORDERED THAT Defendants Sheriff Garcia's and Sergeants Coker's and Jones's motion for summary judgment (**Instrument No. 63**) is **GRANTED**. IT IS FURTHER ORDERED THAT Defendant Harris County's motion for

summary judgment (**Instrument No. 72**) is **GRANTED**. IT IS FURTHER ORDERED THAT Defendants Deputies Lopez's, Medina's, Goldstein's, Salazar's, Lobos's, Auzenne's, Wilks's, DeAlejandro's, and Goerlitz's motion for summary judgment (**Instrument No. 74**) is **GRANTED**.

The Clerk shall enter this Order and provide a copy to all parties.

**SIGNED** on this the ___ day of January, 2015, at Houston, Texas.

**VANESSA D. GILMORE**
**UNITED STATES DISTRICT JUDGE**

33